UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROBERT D. GORDON,

        Plaintiff,

v.

ROYAL PALM REAL ESTATE INVESTMENT FUND I, LLLP, et al.,

        Defendants.

Case No. 09-11770

Honorable Julian Abele Cook, Jr.


## ORDER

This is a case in which the Plaintiff, Robert D. Gordon,[1] has accused the Defendants - namely, Alan D. Goddard, Jr., Michael A. Lichtenstein, and Eric Bloom[2] - of having wrongfully induced Legisi to invest twenty million dollars in "thinly-traded securities and in a real estate venture called 'Royal Palm.'" (Pl.'s Resp. to Defs.' Mot. to Dismiss at 1). According to the Plaintiff, this case pertains to the alleged misconduct by the Defendants subsequent to the

---

[1] Gordon is the Receiver of the Estates of Gregory McKnight, Legisi Marketing, Inc., and Legisi Holdings, L.L.C. (collectively, "Legisi") in a Securities and Exchange Commission enforcement action that is currently pending in another court within this District (namely *United States Securities and Exchange Commission v. McKnight, et al.*, E.D. Mich., 08-11887. In his capacity as the Receiver, he is seeking to recover the assets of those persons who were victims of an alleged Ponzi scheme by McKnight.

[2] The Defendants who have been identified by the Plaintiff are Royal Palm Real Estate Investment Fund I, LLP; Royal Palm Investment Management Company, LLC; Royal Marketing Services, LLC; Robert Rosetto; Roxanne Rosetto; Bruce Rosetto; Alan D. Goddard, Jr.; Michael A. Lichtenstein; and Eric Bloom. However, the now-pending motion pertains to only three of the named Defendants (i.e., Goddard, Lichtenstein, and Bloom), who will be referred to collectively as "the Defendants." The other Defendants, who will not be directly affected by this order, will be identified as "the Royal Palm Defendants."

investment by Legisi Marketing of nearly nine million four hundred thousand dollars in Royal Palm. Currently before the Court is the Plaintiff's motion for the imposition of sanctions against the Defendants.

I.

The pending motion arises from a complicated procedural history. McKnight allegedly operated an internet loan scheme called Legisi.com that has been characterized by the Plaintiff as "an obvious giant Ponzi scheme." (First Am. Compl. at ¶ 31). In March 2007, the Defendants, through their brokerage firm, Sierra Equities, Ltd. ("Sierra"), established a broker-customer relationship with Legisi Marketing. This relationship produced an agreement whereby Legisi Marketing would advance funds to Sierra, which would, in turn, invest these monies and, thereby, yield high rates of return. (*Id.* at ¶¶ 40-41). One such investment bore the name of the "Royal Palm Realty Investment Fund I, LLLP," with whom Legisi Marketing had executed a subscription agreement and a partnership agreement. (*Id.* at ¶ 47).

Beginning in May 2007, the Securities and Exchange Commission ("SEC") made a series of requests for the production of documents in connection with a "non-public inquiry" that it was conducting. In making these requests, it asked Sierra, through Bloom and others, to produce certain documents relating to the activities of Legisi. (Defs.' Resp. to Pl.'s Mot. for Sanctions at Ex. A). Sierra, despite having transmitted a variety of documents to the SEC at its request, contends that it cannot locate any record of the documents that it had produced. (*Id.* at 5). In March 2008, the SEC sent Goddard a subpoena in connection with its "non-public investigation" along with a request to produce certain documents relating to Legisi. (*Id.* at Ex. B). During the month of April 2008, Goddard produced over sixteen hundred pages of documents, all in response to the SEC's

request. Gordon was appointed Receiver of the various Legisi estates on May 5, 2008. He contends that - as part of his "pre-suit investigation of possible claims" - he obtained copies of the documents that had been previously submitted to the SEC in May 2007. (Pl.'s Mot. for Sanctions at 4).

On March 23, 2009, the Plaintiff initiated an arbitration proceeding with the Financial Industry Regulatory Authority ("FINRA") in which he charged the Defendants and Sierra[3] with having committed securities fraud and other related violations. On May 7, 2009, the Plaintiff filed a complaint against the Defendants and the Royal Palm Defendants in this Court. A first amended complaint followed seven months later. However, two weeks thereafter, the Defendants challenged the efficacy of the claims within the amended complaint by filing motions (1) to dismiss, or in the alternative, stay the litigation pending the finality of the arbitration hearing and, (2) for the imposition of sanctions against the Plaintiff. On January 22, 2010, the Royal Palm Defendants joined the Defendants when they filed a motion to stay the instant action pending the resolution of the arbitration proceedings. The Plaintiff has expressed opposition to both of these requests.

In their motions, the Defendants argue that the Plaintiff should be precluded from bringing this lawsuit because the claims in this Court are virtually identical to those issues in the pending arbitration proceeding. When the Plaintiff commenced the arbitration action, he signed a "Uniform Submission Agreement" in which he agreed to be bound by the rules of FINRA. The relevant rules, for present purposes, provide as follows:

> FINRA Rule 12209:
> During an arbitration, no party may bring any suit, legal action, or

---

[3] The responding parties in the arbitration proceeding will be referred to as "the FINRA Defendants."

3

>  proceeding against any other party that concerns or that would resolve any of the matters raised in the arbitration.

> FINRA Rule 12200:
>> Parties must arbitrate a dispute under the Code if:
>>> Arbitration under the Code is either:
>>> (1) Required by a written agreement, or
>>> (2) Requested by the customer;
>>>
>>> The dispute is between a customer and a member or associated person of a member; and
>>>
>>> The dispute arises in connection with the business activities of the member or the associated person . . . .

It is the contention of the Defendants that the Plaintiff, in agreeing to be bound by these rules, relinquished his right to pursue relief in any other forum with respect to "any of the matters raised in the arbitration" or any "dispute [that] arises in connection with the [Defendants'] business activities." Furthermore, they argue that inasmuch as (1) the claims in this lawsuit are "virtually identical" to and are "duplicative" of the claims submitted to arbitration, and (2) the relief sought in the instant lawsuit is "subsumed within the broad relief sought in the pending FINRA arbitration," the present case should be dismissed in favor of a resolution of the contested issues through arbitration.

The Plaintiff disagrees. In expressing his disagreement with the Defendants' argument, he contends that this lawsuit contains claims that are substantively different from those pursued in arbitration. The Plaintiff argues that the arbitration claims pertain to the FINRA Defendants' conduct when they induced Legisi to invest in certain securities. He further submits that the now pending litigation pertains to the Defendants' actions after Legisi became a limited partner in the Royal Palm real estate venture.

In reply, the Defendants have advanced another basis upon which the Court can, and should, adopt their rationale; namely, that the New Account Agreement between Legisi Marketing and Sierra included a "broad arbitration provision stating that 'all claims, disputes and other matters arising out of or relating to this agreement'" must be arbitrated. (Defs.' Reply in Support of Defs.' Mot. to Dismiss at 2). In support of this position, they attached a three-page document to their brief as Exhibit A - the third page of which contained the above-quoted arbitration clause. Furthermore, the Defendants maintained that the Client Margin Agreement between Sierra and Legisi Marketing contained "an even broader arbitration provision." (*Id.*). According to them, "the broad contractual arbitration provisions in Legisi Marketing's account agreements [ ] clearly contemplate that ***any controversy*** relating to ***any transaction*** with the FINRA Defendants will be arbitrated."[4] (*Id.*) (emphasis in original).

On April 13, 2010, the Court conducted a hearing for the purpose of evaluating the merit, if any, of the Defendants' motions. In the course of articulating his opposition to the pending motions, the Plaintiff set forth some very specific allegations of newly discovered evidence of fraud by the Defendants and their counsel. Specifically, he contended that the document that had been represented by the Defendants to be the New Account Agreement between Sierra and Legisi Marketing was, in reality, only two pages of this document plus a third page from an agreement between Legisi Marketing and a clearing broker, Sterne Agee. Thus, it appears that the document, which had been claimed by the Defendants to have been an arbitration agreement between Sierra and Legisi Marketing, was actually an arbitration agreement between Sterne Agee and Legisi

---

[4] The Defendants had referred to these arbitration clauses in earlier briefs, but had dismissed them as being "superfluous" in light of the rules within the Uniform Submission Agreement.

Marketing - an agreement to which Sierra was not a party.

Reasoning that these assertions of fraud, if supported by competent evidence, could have the practical and legal effect of undercutting many - if not all - of the Defendants' theories of defense, the Court held those motions in abeyance and authorized the Plaintiff to file a motion which would specifically address his allegations of fraud. Thereafter, the Plaintiff filed a motion in which he requested the Court to (1) deny the Defendants' pending motions; (2) award sanctions - pursuant to its inherent authority, Federal Rule of Civil Procedure 11(c), and/or 28 U.S.C. § 1927 - for his costs and attorney fees; and (3) stay the FINRA arbitration proceeding, which would allow him to consolidate all of his claims and proceed against the Defendants in this federal court.

The Defendants submit that this motion should be denied because of (1) the Plaintiff's failure to comply with the procedural requirement of giving them notice as well as an opportunity to remedy the alleged violation before filing a motion for sanctions with the Court; and (2) a lack of any legal or factual support for his allegations. After full briefing and oral arguments, the Plaintiff's motion is now ripe for an evaluation and final determination by the Court. Because the procedural issue implicates the propriety of various types of sanctions - if sanctions are indeed appropriate - this Court will first address the merits of the Plaintiff's claims before turning to what would otherwise appear to be a threshold procedural issue.

II.

The Court will first consider the factual and legal bases of the Plaintiff's request for the imposition of sanctions. It is the Plaintiff's position that the documents which had been submitted to the SEC by Bloom - and subsequently turned over to him as part of his "pre-suit investigation" - included copies of the three pages presently at issue which were presented in a manner that was

6

identical to the manner in which they were proffered as Exhibit A to the Defendants' reply brief. Moreover, in response to a subpoena served by the Plaintiff, the Defendants produced these same three pages presented in the same manner. The Plaintiff maintains that he was induced to file the arbitration proceeding on the basis of this three-page document which purported to include an arbitration clause between Legisi Marketing and Sierra.

In response, the Defendants deny the Plaintiff's accusations of fraud, contending that they never represented to him that all three of the pages were a part of the Sierra-Legisi Marketing agreement. Moreover, the Defendants assert that a casual observation of these three pages reveals that they originated from separate agreements: "As is evident by the way that Sierra produced the 'account opening documents' . . . , those documents are the *signature pages* for account agreements as kept by Sierra in the usual course of its business . . . . A simple review of the documents reflects that they are signature pages and are incomplete, although the facsimile page numbers reflect that the documents were sent and received together as a group." (Defs.' Resp. to Pl.'s Mot. for Sanctions at 12 and n.10).

In its analysis of this dispute, the Court concludes that the explanations by the Defendants are simply not credible for several reasons. First, the Defendants clearly and unequivocally represented to the Court that the challenged three pages were all part of the Sierra-Legisi Marketing New Account Agreement. They described the relevant exhibit as the "New Account Form, Exhibit A hereto, for Legisi Marketing's Account at Sierra" (Defs.' Reply in Support of Defs.' Mot. to Dismiss at 2), and plainly stated that the three pages were all part of the same document and thus related to the same account. It is not remotely plausible that, when the Defendants referred to the "New Account Form. . . for Legisi Marketing's Account at Sierra," they were actually rerpesenting

7

the three pages as the "New Account Form for Legisi Marketing's Account at Sierra plus the signature page for Legisi Marketing's Clearing Broker Agreement with Sterne Agee."

Second, the Defendants described Exhibit B in their reply as the "Client Margin Agreement . . . for that account," where the reference unmistakably was to Legisi Marketing's account with Sierra. Yet the attached Client Margin Agreement quite clearly refers to Legisi Marketing's account with Sterne Agee - and thus this agreement, too, is an agreement to which Sierra was not a party.

Third and significantly, the Defendants quoted language from the third page - a page which they now acknowledge was not part of their agreement with Legisi Marketing - as representing the arbitration clause between Sierra and Legisi Marketing: "The New Account Form, Exhibit A hereto, for Legisi Marketing's account at Sierra contains a broad arbitration provision stating that 'all claims, disputes and other matters arising out of or relating to this agreement . . .' shall be submitted to arbitration." (Defs.' Reply in Support of Defs.' Mot. to Dismiss at 2). Inasmuch as the Defendants represented that the quoted language from the third page was a provision of the Sierra-Legisi Marketing agreement, they quite clearly stated that all three pages were a part of the same agreement. Incredibly, the Defendants continue to argue that the arbitration language from the third page is part of the Sierra-Legisi Marketing agreement, while at the same time claiming that it is evident that the third page is not a part of that same agreement. In their response brief, the Defendants once again represented that the arbitration agreement from the third page is part of the Sierra-Legisi Marketing agreement - "The [Plaintiff] does not dispute that the page bearing the signatures of McKnight, Goddard, and Bloom [page two] and the above-quoted arbitration clause [from page three] is part of the Sierra New Account Application." (Defs.' Resp. to Pl.'s Mot. for Sanctions at 11). Because the Defendants have consistently claimed, and continue to claim, that

8

language from the third page is part of the Sierra-Legisi Marketing agreement, their argument (i.e., that they never attempted to mislead or represent that all three pages were from that agreement) is simply untenable.[5]

The Defendants have also alleged that they are unable to locate any records which identify the documents that were provided by them to the SEC in May 2007 (*e.g.*, Defs.' Resp. to Pl.'s Mot. for Sanctions at 5) ("Bloom has not located any record of the documents provided to the SEC in connection with the May 22, 2007 inquiry."). Furthermore, they contend that the Plaintiff has produced "no evidentiary support whatsoever for his contention" that Bloom submitted these same three pages in the same manner in response to the SEC's 2007 request for "all account opening documents." (Defs.' Resp. to Pl.'s Mot. for Sanctions at 7). However, in support of their claim that the Plaintiff's accusation (to wit, that the Defendants intentionally "cobbled together" pages from separate documents) is "patently false," they also submit that "the repeated production of the documents in question in the same form substantiates that they were produced in the manner in which Sierra maintains those documents in the usual course of its business." (*Id.* at 12 n.10). Thus, the Defendants seemingly claim that these three pages were routinely stored in this manner and would, in the ordinary course of business, have been submitted to the SEC - both in response to the "informal inquiry" in May 2007 and the subpoena in April 2008 - in the same form that they were submitted to this Court and to the Plaintiff in response to his subpoena.

---

[5]To the extent that the Defendants may claim that their misrepresentation of language from the Sterne Agee-Legisi Marketing agreement as being part of the Sierra-Legisi Marketing agreement was the result of inadvertence or a mistake, the Court notes - and credits - the Plaintiff's argument that the Defendants, who regularly use these forms in the course of their business, must be presumed to have been aware of their content and sources. Moreover, any such argument would plainly contradict their assertion that a cursory review of these three pages would reflect that they were pages from separate agreements.

Thus, and contrary to the Defendants' protestations, the Court concludes that they did actively and repeatedly misrepresent the nature and origin of the three pages which were described by them as the "New Account Form . . . for Legisi Marketing's Account at Sierra." The Defendants' more recent contention that it would be "evident" upon a "simple review" that these were pages from separate agreements which had been stored together "in the usual course of its business" (Defs.' Resp. to Pl.'s Mot. for Sanctions at 12 and n.10) - when, in fact, they actively maintained that these pages were all part of the same agreement - strikes the Court as challenging credulity. To claim, as they now do, that it would be unreasonable to believe that which they had actively represented to the Court to be true is, frankly, outrageous and cannot be construed as anything other than bad faith.

### III.

Having determined that the Defendants did engage in acts of misrepresentation, the Court now turns to the Plaintiff's application for relief. With respect to the Plaintiff's requests that the Court (1) deny the pending motions, and (2) enjoin the arbitration proceedings, the Court must first determine if the misrepresentations had any actual impact on the course of these proceedings.

On March 9, 2009, the Plaintiff sent subpoenas to the Defendants in which he requested that they produce, *inter alia*, "[a]ll Documents relating to any of Legisi's investments" in various enterprises. The three pages now in dispute were among the documents produced in response to these subpoenas. The Plaintiff also says that he obtained these three pages in an identical form from the SEC as a part of his "pre-suit investigation." The Plaintiff asserts that he "filed his FINRA Statement of Claim on March 23, 2009, in reliance upon the [ ] Defendants' documents and representations." (Pl.'s Reply in Support of Pl.'s Mot. for Sanctions at 5).

The Defendants challenge the Plaintiff's assertions, stating that (1) he has not provided any evidentiary support for his purported reliance, and (2) his failure to subpoena the new account application or even inquire about the documents while deposing the Defendants undercuts any claims of reliance upon their allegedly false representations when deciding to file the arbitration claim. (Defs.' Resp. to Pl.'s Mot. for Sanctions at 16 n.14) ("The [Plaintiff] cannot contend that he reasonably relied on Bloom's act of production, particularly when [he] deposed Bloom prior to filing the FINRA Arbitration and thus had an opportunity to question him about the documents he had produced. At Bloom's deposition, counsel for the [Plaintiff] did not ask Bloom a single question about the 'account opening documents' or about any arbitration agreement."). Contrary to the Defendants' argument, the Court construes the Plaintiff's failure to make any further inquiry into the authenticity of these documents as consistent with his claim that he did not suspect that they were pages from separate agreements until much later in the litigation.

However, throughout this litigation, the Plaintiff has repeatedly claimed that his decision to commence arbitration proceedings through FINRA was "voluntary" and an "exercise of [his] right to arbitrate" under FINRA Rule 12200:

- "Plaintiff did not unreasonably or vexatiously multiply the proceedings within the meaning of 28 U.S.C. § 1927 by exercising his right under Rule 12200 to submit some- but not all -of his claims against Defendants to arbitration." (Pl.'s Resp. to Defs.' Mot. for Sanctions at 3).

- "Plaintiff did not violation [sic] Rule 12200 by exercising his right to submit some- but not all - of his claims against the moving Defendants to arbitration . . . ." (Pl.'s Resp. to Defs.' Mot. to Dismiss at 5).

- "Plaintiff voluntarily submitted his broker-dealer related claims against the FINRA Respondents to arbitration." (Pl.'s Resp. to Defs.' Mot. to Dismiss at 10).

The first two statements could be reasonably construed to mean that the right that the Plaintiff

11

exercised was not the right to arbitrate, but rather the right to determine which claims to submit to arbitration and which to submit to this federal court. The third statement, however, is not readily amenable to any meaning other than that the Plaintiff did not believe himself to be bound - by contract or otherwise - to arbitrate, but rather freely and voluntarily selected the desired forum. Given this, the Plaintiff cannot now be heard to claim that he felt compelled to arbitrate based upon the Defendants' misrepresentations.

Because the Plaintiff voluntarily submitted at least a portion of his claims to arbitration, the Defendants' misrepresentations - egregious and repeated as they may have been - were not the cause of the Plaintiff's forum selection. Thus, the Plaintiff has failed to show that (1) his decision to initiate arbitration proceedings was the result of anything other than a voluntary decision by him, or (2) he would not have initiated the arbitration proceeding but for the Defendants' misrepresentations. Because the Plaintiff has not shown that the misrepresentations had any impact whatsoever on his decision to file the arbitration claim, the Court denies his requests that the Court (1) reject the Defendants' pending motions, and (2) enter an injunction which would stay the FINRA arbitration proceeding and allow him to consolidate all of his claims against all the Defendants in this forum.[6]

IV.

Finally and with respect to the Plaintiff's request for the imposition sanctions against the Defendants, the Court must now address the threshold procedural issue. Addressing this issue of

---

[6] Moreover, the Defendants are correct when they argue that the Plaintiff has wholly failed to (1) even attempt to make out the necessary elements for injunctive relief and (2) provide any legal analysis of whether this Court has the authority to enjoin the FINRA arbitration proceeding currently underway in Chicago, Illinois.

sanctions, the Defendants contend that the Plaintiff's motion for sanctions "is so procedurally defective that it should be denied out of hand." (Defs.' Resp. to Pl.'s Mot. for Sanctions at 14). Specifically, they argue that, because the Plaintiff did not comply with the "safe harbor" provision of Federal Rule of Civil Procedure 11 by providing them with twenty-one days to remedy any alleged violations before filing the motion with the Court, sanctions are unavailable. *See* Fed. R. Civ. P. 11(c)(2) ("The motion [for sanctions] must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."); *see also Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997) (agreeing with other courts that Rule 11 is "unquestionably explicit" in making the safe harbor provision an "absolute requirement").

However, there is no safe harbor requirement when Rule 11 sanctions are initiated by the Court rather than by motion of a party. *Ridder*, 109 F.3d at 297 n.8. Unlike a party-initiated Rule 11 sanction, a court-initiated Rule 11 sanction may not include monetary sanctions that are payable to the affected party. Rather, any monetary sanction must be payable to the court. *See Rasmussen v. Fleetwood Enters., Inc.*, Nos. 06-13883, 06-13884, 2007 WL 1106138, at *11 and n.9 (E.D. Mich. Apr. 10, 2007) (citing advisory committee notes to Rule 11); *see also* Fed. R. Civ. P. 11(c)(4) (emphasis added) ("The sanction may include . . . an order to pay a penalty into court; or, *if imposed on motion* and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."). In the present case, the Court specifically authorized the Plaintiff to file "any motion, which will specifically address his charges of fraud by the opposition parties and their

13

respective counsel." (Dkt. No. 45 at 1). However, the issue of how any Rule 11 issues would be properly characterized need not be resolved because, as the Plaintiff correctly asserts, the Court may also issue sanctions pursuant to its inherent authority to penalize bad faith conduct. There is no safe harbor requirement with respect to the exercise of the inherent authority of the Court to sanction bad faith conduct. *E.g.*, *Rasmussen*, 2007 WL 1106138, at *8, 11-12 (finding requested Rule 11 sanctions unavailable because of failure to comply with safe harbor requirement, but ordering requested sanctions pursuant to inherent authority of court). Furthermore, the Court finds that an exercise of its inherent authority is the most appropriate vehicle for addressing the Defendants' conduct in the circumstances presented here.

Where a litigant or attorney engages in bad-faith conduct, a district court may exercise its inherent authority to impose a sanction of attorney fees and costs, even if procedural rules sanction the same conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991). The court should ordinarily consider statutory or procedural rules as the first step before imposing sanctions, "[b]ut if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* at 50. Further, the Sixth Circuit Court of Appeals has held that "*Chambers* does not explicitly require in every instance that a district court first determine whether the conduct could be sanctioned under the rules or relevant statutes before considering sanctions under its inherent authority." *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 (6th Cir. 2002) An exercise by the court of its inherent authority to impose attorney fees is proper where "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45-46 (internal quotation marks and citations omitted). Such is the case where, for example, "a court finds that fraud has been practiced upon it, or that the

very temple of justice has been defiled." *Id.* at 46 (internal quotation marks and citation omitted).

In the circumstances presented here, the Court finds that an exercise of its inherent authority is the most appropriate means of sanctioning the Defendants' conduct. Where, as here, Rule 11 applies to some of the challenged conduct - to wit, submitting pleadings to this Court that misrepresented the nature of the three-page document - but not other conduct - such as submitting the same three-page document, in the same manner, in response to requests from the SEC and the Plaintiff - the intertwined nature of the sanctionable conduct is most amenable to sanctions under the inherent authority of the court. *See Chambers*, 501 U.S. at 50 (upholding sanctions ordered pursuant to court's inherent authority where "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address"); *First Bank of Marietta*, 307 F.3d at 512 (imposition of sanctions under inherent authority rather than procedural rules which sanction same conduct was especially appropriate where some conduct was reachable by Rule 11 and some was not).

Similarly, § 1927 would be an inappropriate basis for sanctioning the conduct at issue here because (1) it applies only to attorneys, and thus would not reach the conduct of the Defendants, who are believed not to be members of the bar; and (2) the identified misconduct was objectionable not because it "multipl[ied] the proceedings . . . unreasonably and vexatiously," as required under 28 U.S.C. § 1927, but because it perpetrated a fraud on the Court and on the Plaintiff.

Because the applicable procedural rules and statutes are not "up to the task" of addressing the Defendants' misconduct, and inasmuch as the Court has already determined that they engaged in bad-faith conduct, its inherent authority is the most appropriate means of addressing the Plaintiff's request for sanctions. Therefore, the Court will, and does, exercise its inherent authority

15

to award to the Plaintiff an assessment of those attorney fees and costs that were incurred by him in responding to the Defendants' misrepresentations.

V.

For the reasons that have been set forth above, the Court (1) rejects the Plaintiff's request that the Defendants' pending motions be denied; (2) denies the Plaintiff's application that the ongoing FINRA arbitration proceedings be enjoined; and (3) grants the Plaintiff's request for an award of attorney fees and costs incurred in responding to the Defendants' bad-faith arguments and misrepresentations. Because the Plaintiff has not provided any evidence of the amount of such costs and fees, he is directed to submit appropriate documentation to the Court that will detail those reasonable attorney fees and costs which are directly attributable to the misrepresentations by the Defendants within a period of fourteen (14) days from the date of this order. The Defendants are authorized to submit a response that will challenge the validity, accuracy or reasonableness of the requested attorney fees and costs within fourteen (14) days of the Plaintiff's submission to the Court. Finally, the Plaintiff is entitled to file a reply within a period of seven (7) days thereafter.

IT IS SO ORDERED.

Dated:  January 10, 2011              s/Julian Abele Cook, Jr.
        Detroit, Michigan              JULIAN ABELE COOK, JR.
                                       United States District Court Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on January 10, 2011.

s/ Kay Doaks
Case Manager