UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT D. GORDON,

        Plaintiff,

v.

ROYAL PALM REAL ESTATE INVESTMENT FUND I, LLLP, et al.,

        Defendants.

Case No. 09-11770
Honorable Julian Abele Cook, Jr.

ORDER

The Plaintiff in this action, Robert D. Gordon, is the Receiver for the Estates of Gregory McKnight, Legisi Marketing, Inc., and Legisi Holdings, LLC (collectively, "Legisi") in a Securities and Exchange Commission enforcement action that is currently pending in another court within this District.[1] In his capacity as the Receiver, he is seeking to recover the assets of those individuals who were victims of an alleged Ponzi scheme carried out by McKnight.

This lawsuit relates to allegations by Gordon that the Defendants committed a variety of common law and statutory violations at the federal and state (Michigan and Florida) levels pertaining to Legisi's investments in those securities that had been recommended and/or managed by the Defendants. Gordon has specifically identified three of the Defendants - namely, Alan D. Goddard, Jr., Michael A. Lichtenstein, and Eric Bloom (collectively identified as the FINRA

---

[1] *SEC v. McKnight*, E.D. Mich., 08-11887.

1

Defendants)[2] - as the persons who wrongfully induced Legisi to invest twenty million dollars in "thinly-traded securities and in a real estate venture called [Royal Palm Real Estate Investment Fund I, LLLP ('RP Investment')]."(Pl.'s Resp. to Defs.' Mot. to Dismiss at 1). According to Gordon, this case - as it relates to the FINRA Defendants - pertains to their alleged misconduct subsequent to an investment by Legisi Marketing of nearly nine million four hundred thousand dollars in the RP Investment enterprise.

Gordon has also accused another group of Defendants - namely, RP Investment; Royal Palm Investment Management Company, LLC; Royal Marketing Services, LLC; Robert Rosetto; Roxanne Rosetto; and Bruce Rosetto (collectively called the Royal Palm Defendants) - of wrongdoing in connection with the management of Legisi's investments in the RP Investment enterprise. In addition, he has made vicarious liability claims against the Royal Palm Defendants for the conduct of their alleged agent who proffered a substantial number of investment recommendations to Legisi.

Currently before the Court are the following motions; to wit, (1) the FINRA Defendants' motion to dismiss or, in the alternative, to stay these proceedings; (2) the FINRA Defendants' motion for the imposition of sanctions against Gordon; and (3) the Royal Palm Defendants' motion to stay these proceedings. Gordon opposes all three motions.

I.

According to Gordon, McKnight operated an internet loan scheme (the "Legisi Program") through a web site, Legisi.com, that Gordon characterized as being "an obvious giant Ponzi

---

[2] For the purpose of the case at hand, this moniker has been given to these individuals, all of whom are also respondents in an ongoing arbitration proceeding that Gordon initiated with the Financial Industry Regulatory Authority ("FINRA").

2

scheme." (First Am. Compl. at ¶ 31). Gordon submits that Legisi Holdings, LLC - a West Indies limited liability company with its principal place of business in Michigan - was the entity through which McKnight offered Legisi Program investment contracts. Gordon asserts that the investors' funds were thereafter deposited by McKnight into the bank and brokerage accounts held by Legisi Marketing, Inc., a Michigan corporation.

During this period of time, the FINRA Defendants were employees of a securities brokerage firm, Sierra Equities, Ltd. ("Sierra Equities"). Through the efforts of these FINRA Defendants, Sierra Equities established a broker-customer relationship with Legisi Marketing in March 2007. Gordon complains that Sierra Equities persuaded McKnight to invest more than $20 million in proceeds from the Legisi Ponzi scheme into various "thinly-traded securities" and in RP Investment.

RP Investment is a real estate investment venture that was organized as a limited liability limited partnership in Florida. In May 2007, Sierra Equities was appointed to serve as an agent to promote and sell ownership units in the RP Investment venture. During the same month, McKnight, acting on behalf of Legisi Marketing, signed a subscription agreement and entered into a partnership agreement with RP Investment. On the basis of this partnership agreement, Legisi Marketing became a limited partner of RP Investment, whose general partner was the Royal Palm Investment Management Company ("RP Management"), a Florida limited liability company that was managed by Robert Rosetto. As the general partner, RP Management had the exclusive right to manage the business of RP Investment. Royal Palm Marketing Services, LLC ("RP Marketing") - also a Florida limited liability company - was a 50% member of RP Management. The FINRA Defendants were also members of RP Management. RP Marketing, in turn, had two 50% members;

namely, Robert Rosetto and Roxanne Rosetto. Although Bruce Rosetto, the father of Robert and Roxanne Rosetto, is not identified as a manager, partner, officer, or director of any of these corporate entities, he "exercised control over the day-to-day policy and management such that he functioned as manager, partner, officer and director" of RP Investment, RP Management, and RP Marketing. (First Am. Compl. at ¶ 19).

Gordon was appointed to serve as the Receiver of the various Legisi estates on May 5, 2008. During the following year, he initiated an arbitration proceeding on March 23, 2009, with the Financial Industry Regulatory Authority ("FINRA") in which he charged the FINRA Defendants and Sierra Equities with having committed securities fraud and other related violations. The FINRA claims were premised on the FINRA Defendants' alleged misconduct in recommending certain investments to Legisi Marketing through McKnight, including the approximately $9.4 million that Legisi Marketing had invested in RP Investment.

Six weeks later, Gordon filed the instant lawsuit against the FINRA and Royal Palm Defendants. After the FINRA Defendants moved to dismiss the complaint - alleging that it overlapped with, and was precluded by, the ongoing FINRA arbitration proceeding - Gordon filed a first amended complaint seven months after filing his original complaint. The first amended complaint omitted certain counts that had been set forth in the original complaint and in the FINRA arbitration. Two weeks thereafter, the FINRA Defendants challenged the efficacy of the claims within the amended complaint by filing motions (1) to dismiss or, in the alternative, stay the litigation pending the finality of the arbitration hearing and, (2) for the imposition of sanctions against Gordon. On January 22, 2010, the Royal Palm Defendants filed a motion to stay the instant action pending a resolution of the arbitration proceedings. Gordon has expressed opposition to all

of these requests. The Court will address each motion seriatim.

II.

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a district court must accept the plaintiff's well-pleaded allegations as true and construe each of them in a light that is most favorable to it. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010). However, this assumption of truth does not extend to the plaintiff's legal conclusions because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). The complaint "must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (citation and internal quotation marks omitted).

In order to survive an application for dismissal, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this standard, the "plaintiff [must] plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. In essence, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Moreover, "documents attached to the pleadings become part of the pleading and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)). Specifically, "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Weiner, D.P.M. v. Klais and Co.*,

108 F.3d 86, 88 n.3 (6th Cir. 1997); *see also Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). When affidavits "'do nothing more than verify the complaint,' and when they 'add[] nothing new, but, in effect, reiterate[] the contents of the complaint itself,' they are not truly 'materials . . . outside the pleading.'" *Yeary v. Goodwill Industries-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997) (citing *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993)). Also, supplemental documents attached to the motion to dismiss do not convert this pleading to one for summary judgment where the documents do not "rebut, challenge, or contradict anything in the plaintiff's complaint." *Song,* 985 F.2d at 842 (citing *Watters v. Pelican Int'l, Inc.*, 706 F. Supp. 1452, 1457 n.1 (D. Colo. 1989)).

### III.

In their motion to dismiss, the FINRA Defendants argue that Gordon should be precluded from bringing this lawsuit because the claims he has asserted against them in this Court are virtually identical to those issues in the pending arbitration proceeding. They have attached to their motion the statement of claim which Gordon has acknowledged was filed by him in the FINRA arbitration proceeding. Moreover, Gordon acknowledges having signed a FINRA arbitration submission agreement, which contains the following language:

> The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.

> The relevant rules for present purposes provide as follows:

> FINRA Rule 12209:
>> During an arbitration, no party may bring any suit, legal action, or proceeding against any other party that concerns or that would resolve any of the matters raised in the arbitration.

> FINRA Rule 12200:
>> Parties must arbitrate a dispute under the Code if:
>>> Arbitration under the Code is either:
>>>> (1) Required by a written agreement, or
>>>>
>>>> (2) Requested by the customer;
>>>
>>> The dispute is between a customer and a member or associated person of a member; and
>>>
>>> The dispute arises in connection with the business activities of the member or the associated person . . . .

It is the contention of the FINRA Defendants that Gordon, in agreeing to be bound by these rules, relinquished his right to commence - in any forum - any proceeding "that concerns or that would resolve any of the matters raised in the arbitration" [or that] "arises in connection with the [Defendants'] business activities." Furthermore, they argue that inasmuch as (1) the claims in this lawsuit are "virtually identical" to and are "duplicative" of the claims submitted to arbitration, and (2) the relief sought in the instant lawsuit is "subsumed within the broad relief sought in the pending FINRA arbitration," the present case should be dismissed in favor of a resolution of the contested issues through arbitration.[3]

---

[3] The FINRA Defendants had also proffered an alternative argument, in which they asserted that Gordon was contractually bound to arbitrate his claims because the New Account Agreement between Legisi Marketing and Sierra Equities included a "broad arbitration provision stating that 'all claims, disputes and other matters arising out of or relating to this agreement'" must be arbitrated. (Defs.' Reply in Support of Defs.' Mot. to Dismiss at 2). However, the provision to which Defendants referred was from an agreement between Legisi Marketing and its clearing broker, Sterne Agee. In a separate order, the Court has imposed sanctions against the FINRA Defendants for engaging in bad faith conduct in representing that the Sterne Agee-Legisi Marketing arbitration provision was actually a provision of the Sierra Equities-Legisi Marketing agreement. However, the Court also determined that Gordon had filed the arbitration proceeding voluntarily, and not because of the misrepresentation that he was contractually obligated to do so. Thus, these revelations do not undermine the legal efficacy of the fact that Gordon signed the FINRA arbitration agreement. As a consequence, the pending motions will be resolved without

Gordon disagrees. Rather, he contends that the claims in this lawsuit are substantively different from those pursued in arbitration. He contends that the arbitration claims pertain to the FINRA Defendants' conduct when they induced Legisi to invest $20 million in certain securities, whereas the now-pending litigation pertains to their activities after Legisi invested $9.4 million and became a limited partner in RP Investment. Furthermore, Gordon submits that RP Investment was a "startup real estate fund that had no other investors" and that this information was not disclosed by Sierra Equities to McKnight. He further maintains that the Defendants (1) induced Legisi to purchase companies that were not commercially reasonable; (2) paid themselves unreasonably high fees in connection with these purchases; and (3) acquired a fifty percent (50%) ownership interest in RP Investment without ever making any monetary contributions. Thus, he insists that these claims relate exclusively to the mismanagement of RP Investment and the Defendants' breach of fiduciary duties to Legisi as a limited partner.

> Pursuant to the Federal Arbitration Act,
>
> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. In 1984, the Supreme Court stated that by ratifying the Federal Arbitration Act, Congress "declared a national policy favoring arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984). This Act also states that "[a] party aggrieved by the alleged failure, neglect, or refusal

---

any consideration of the FINRA Defendants' alternative argument.

of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that the arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

However, before directing the parties to arbitrate, "a court must engage in a limited review to determine whether the dispute is arbitrable; meaning [1] that a valid agreement to arbitrate exists between the parties and [2] that the specific dispute falls within the substantive scope of that agreement." *Watson Wyatt & Co. v. S.C. Holdings, Inc.*, 513 F.3d 646, 649 (6th Cir. 2008). Moreover, broadly written arbitration clauses will be enforced except for the presentation of "the most forceful evidence of a purpose to exclude the claim from arbitration." *Id.* (quoting *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir. 2003)). "It is a well-established rule that any doubts regarding arbitrability should be resolved in favor of arbitration." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). Notwithstanding the existence of a federal policy in favor of arbitration, the Sixth Circuit Court of Appeals has held that "arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *United Steelworkers, Local No. 1617 v. Gen. Fireproofing Co.*, 464 F.2d 726, 729 (6th Cir. 1972).

In the case *sub judice*, it is clear - and Gordon does not dispute - that the Uniform Submission Agreement constitutes a valid agreement to arbitrate. Rather, the fight here centers on the second prong of the required analysis; namely, whether the dispute in the federal case falls within the substantive scope of that arbitration agreement. Gordon maintains that the claims in the instant federal lawsuit relate to the FINRA Defendants' roles in RP Investment (specifically, as

9

members of RP Management, which, in turn, is the general partner in RP Investment), whereas the causes of action he has advanced in the arbitration deal with the FINRA Defendants' actions as broker-dealers in inducing Legisi to invest in various securities.

On the other hand, the FINRA Defendants note that this distinction is not of any substantive consequence to the issues in this case. In the instant case, Gordon has alleged three counts against the FINRA Defendants; namely, (1) unjust enrichment, and (2) two causes of action under the Michigan Uniform Fraudulent Transfer Act, Mich. Comp. Laws § 566.31, et seq. (Counts IX, X, XI, respectively). Significantly, Gordon has pursued these same claims against these same individuals in arbitration.

In addition, although Gordon attempts to distinguish the underlying alleged wrongful acts of the FINRA Defendants, it appears that the relief sought by him in the instant case is subsumed in the relief that he is attempting to recover in arbitration. For instance, in the arbitration proceeding, Gordon seeks to recover the entire amount in investments (over $20 million) made by Legisi in various securities. This amount appears to include the nearly $9.4 million that was invested by Legisi in the RP Investment real estate venture. These monies, in turn, were allegedly used to pay the FINRA Defendants all of their fees and commissions once the RP Investment partnership was formed. Thus, Gordon is seemingly attempting to recover the total sum of the Legisi investments in arbitration and, in addition, to recover a sub-category of those funds in the instant lawsuit, which – as argued by his adversaries - raises the specter of an attempt to obtain a double recovery.

Gordon questions the FINRA Defendants' reliance in their brief upon *Liberte Capital Group, LLC v. Capwill*, 148 Fed. Appx. 413 (6th Cir. 2005), contending that this case actually

supports his position. In *Liberte Capital Group*, the court held that a class action could go forward even though a parallel arbitration case had been commenced by the same plaintiffs. 148 Fed. Appx. at 417-18. In rendering its decision, the Sixth Circuit found that (1) the named defendants in the lawsuit were not identified as respondents in the arbitration proceeding, and (2) the relief sought by the plaintiffs in arbitration was "not even remotely related to the purposes of the class action." *Id.* at 417. However, in the case at bar, the FINRA Defendants are also named as respondents in the arbitration proceeding. Moreover, the relief that Gordon seeks in the instant litigation is simply a sub-category of that which he sought to obtain in arbitration. Gordon submits that the instant action should be allowed to go forward because "a judgment against the [FINRA] Defendants in this federal action would result in only partial return to [him], and both the arbitration panel and this Court are capable of ensuring that no double recovery occurs should [he] prevail in the arbitration." (Pl.'s Resp. to Defs.' Mot. to Dismiss at 9). On the other hand and while this action can only support partial recovery of all of Legisi's investments, it is clear that the arbitration could result in an award of the entire amount of over $20 million invested by Legisi, along with exemplary damages, interest, costs, attorney fees, and any additional relief. Especially in light of the requirement that the Court resolve any ambiguities in favor of arbitration, *see Fazio*, 340 F.3d at 392, it concludes that the claims in the instant lawsuit are arbitrable.

Furthermore, Rule 12209 of the FINRA Code of Arbitration Procedure states that no party to a FINRA arbitration may bring an action against another party that "concerns or that would resolve any of the matters raised in the arbitration." Assuming, *in arguendo*, that the issues in this litigation would not "resolve" the matters being pursued by Gordon in arbitration, they do "concern" the claims advanced by him in arbitration. The Oxford English Dictionary defines

11

"concern" as "[1] relate to; be about[;] [2] be relevant to; affect or involve." Applying this broad language to the instant case, it is evident that claims of wrongdoing stemming from (1) the FINRA Defendants' inducement of Legisi to invest in certain securities and (2) the FINRA Defendants' actions in allegedly receiving the benefits of Legisi's investments in one of those securities (Royal Palm) concern and relate to each other.[4] Moreover, the factual allegations which underlie the counts against the FINRA Defendants in Gordon's amended complaint are essentially identical to those underlying the corresponding counts in the Statement of Claim. Thus, it is the conclusion of the Court that the claims brought in this federal proceeding are within the substantive scope of the arbitration agreement contained in the Uniform Submission Agreement.

Because all three of the claims against the FINRA Defendants are within the scope of the arbitration agreement, and inasmuch as the relief sought in the instant lawsuit is subsumed within the claims sought in arbitration, the Court concludes that the appropriate route to undertake is to dismiss the instant action without prejudice as it pertains to the FINRA Defendants. *See Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000) (quoting *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992)) ("The weight of authority clearly supports dismissal of the case when *all* of the issues raised in the district court must be submitted to arbitration."); *Shammami v. Broad Street Sec., Inc.*, 544 F. Supp. 2d 585, 588 n.6 (E.D. Mich. 2008) (citation and internal quotation marks omitted) ("Indeed, [m]ost district courts in this circuit agree that the best procedure for enforcing arbitration agreements is to dismiss the court action without prejudice.").

IV.

---

[4]The FINRA Defendants also cite FINRA Rule 12200 in support of their contention that Gordon must arbitrate his claims. Because of the broad language in Rule 12209, the Court need not address the applicability of this Rule, about which the parties also disagree.

The FINRA Defendants have also asked the Court to sanction Gordon's counsel for "unreasonably and vexatiously" proceeding with the instant lawsuit despite having already commenced a claim against them in arbitration which subsumes all of the relief that Gordon seeks to obtain in this lawsuit. Gordon, in opposing this request, states that there is no arbitration agreement between Legisi and the FINRA Defendants with respect to RP Investment. Therefore, he maintains that the FINRA Code of Arbitration Procedure does not require that he bring the instant claims in an arbitral forum.

> Title 28, Section 1927, entitled "Counsel's liability for excessive costs," states as follows:
>
> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

In a decision that was announced last year, the Sixth Circuit opined that "the proper inquiry is not whether an attorney acted in bad fath; rather a court should consider whether 'an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims.'" *Hall v. Liberty Life Assur. Co.*, 595 F.3d 270, 275-76 (6th Cir. 2010) (quoting *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 396 (6th Cir. 2009)). Accordingly, an award under this statute requires a finding of less than bad faith but more than negligence or incompetence. *Id.* (citations omitted).

The FINRA Defendants make much of the fact that Gordon filed an amended complaint in which he eliminated many of the claims that had overlapped with those claims asserted by him in the arbitration proceeding. They also submit that Gordon's refusal to withdraw these claims -

13

despite their request that he do so - until after the dispositive motion was fully briefed is a "particularly egregious" example of his unreasonable conduct. (Mot. for Sanctions at 8 n.3). However, Gordon's counsel states that he offered to remove these duplicative claims *before* the motion to dismiss was filed, but that the FINRA Defendants refused to concur in that resolution in the absence of a willingness to eliminate *all* of the claims involving these defendants. Thus, Gordon - unnecessarily, as it turned out - sought permission to amend his complaint to eliminate these claims in his response to the first motion to dismiss and in a separate motion filed shortly thereafter. While this course of conduct was certainly not the most efficient of all possible routes, the Court is of the opinion that Gordon's conduct was neither "particularly egregious" nor was it done "unreasonably and vexatiously."

Although the Court has determined that the claims against the FINRA Defendants are within the terms of the Uniform Submission Agreement's arbitration clause, it has also concluded that Gordon's claim to the contrary was not so unreasonable that his counsel knew or should have known that it was "frivolous, or that [his] litigation tactics [would] needlessly obstruct the litigation of nonfrivolous claims," *Hall*, 595 F.3d 275-76. Therefore, the FINRA Defendants' motion for sanctions pursuant to 28 U.S.C. § 1927 is denied.

V.

The Royal Palm Defendants have filed a motion to stay this case pending a resolution of the FINRA arbitration, which is opposed by Gordon.

The Federal Arbitration Act allows piecemeal litigation to occur concurrently where only some of the relevant issues are arbitrable. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Notwithstanding, the Supreme Court has also determined that "[i]n some cases . . . it may

14

be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 n.23. Indeed, several courts within this circuit have exercised their discretion to stay the litigation of nonarbitrable claims pending the outcome of an arbitration. *See, e.g.*, *Stacy v. H&R Block Tax Servs., Inc.*, No. 07-13327, 2008 WL 321300 (E.D. Mich. Feb. 4, 2008); *Vaughn v. Marshall*, No.C2:2:09CV00097, 2009 WL 3260382 (S.D. Ohio Oct. 8, 2009); *Patnik v. Citicorp Bank Trust FSB*, 412 F. Supp. 2d 753 (N.D. Ohio 2005).

This Court recently held that a court should stay litigation of non-arbitrable claims "where a decision in one forum could affect the resolution of claims in the other." *Spartech CMD, LLC v. Int'l Auto Components Grp., N.A.*, No. 08-13234, 2009 WL 440905, at *13 (E.D. Mich. Feb. 23, 2009) (noting different approaches in other circuits but finding common concern for preventing the litigation from impairing resolution of arbitrable issues). A stay may be appropriate if "a lawsuit against a nonsignatory [to an arbitration agreement] depends upon the same facts and is inherently inseparable from the arbitrable claims," *Patnik*, 412 F. Supp. 2d 753, 762 (N.D. Ohio 2005), where the arbitration may resolve issues in the lawsuit, *Sierra EquitiesRutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991), or where staying the litigation would promote the federal policy in favor of arbitration, *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co.*, 242 F.3d 777, 782 (8th Cir. 2001). However, "the movant bears a heavy burden of showing necessity for the stay." *Sierra EquitiesRutile Ltd.*, 937 F.2d at 750 (citing *Nederlandse Erts-Tankersmaatschappij, N. V. v. Isbrandtsen Co.*, 339 F.2d 440, 442 (2d Cir. 1964)) (movant "should demonstrate to the satisfaction of the court [1] that they have not taken nor will take any steps to hamper the progress of the

arbitration proceeding, [2] that the arbitration may be expected to conclude within a reasonable time, and [3] that such delay as may occur will not work undue hardship.").

In the instant case, some of Gordon's claims against the Royal Palm Defendants were brought pursuant to the theory of vicarious liability.[5] The Third Restatement of Agency states that

> A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission.

Restatement (Third) of Agency § 7.08. Throughout Gordon's first amended complaint, he refers to Sierra Equities (i.e., the FINRA Defendants' employer) as the agent of the Royal Palm Defendants, and argues that, in that capacity, it misrepresented certain information to McKnight in an effort to induce him to invest in the Royal Palm real estate venture. Thus, to prove the securities claims against these Royal Palm Defendants based on a theory of vicarious liability, Gordon must first show that their alleged agent (Sierra Equities, through the activities of the FINRA Defendants) committed the cited illegal acts. This conduct is indisputably the subject of the pending arbitration proceeding. Therefore, the claims at issue in the arbitration and the vicarious liability-based claims at issue here are "inextricably intertwined" and a stay of the litigation is appropriate. *See Patnik*, 412 F. Supp. 2d at 762.

Moreover, if the Court allowed these claims to proceed, Gordon would be required to prove

---

[5]Gordon now claims in his responsive brief that the "Royal Palm Defendants may be primarily liab[le] under the federal securities laws even if they did not make a specific oral or written statement to McKnigh[t] or the Legisi entities. Conduct itself can be deceptive." (Pl.'s Resp. to Defs.' Mot. to Stay at 8). However, this theory of liability does not appear to be included in the first amended complaint with respect to the securities claims.

16

that the FINRA Defendants, acting through Sierra Equities, violated the applicable securities laws. However, this precise question is being addressed in the FINRA arbitration. Thus, allowing the case to go forward could "subvert[] the arbitration agreement between" Gordon and the FINRA Defendants. *See Nakamura Trading Co. v. Sankyo Corp.*, No. 05 CV 7205, 2006 WL 1049608, at *5 (N.D. Ill. April 19, 2006).

In addition, the remaining claims, in which Gordon proceeds under a theory of primary liability against the Royal Palm Defendants, are based on facts that are also intertwined with the underlying facts in the arbitration. As the Royal Palm Defendants note, "the alleged securities fraud provided the context for the alleged mismanagement of the Royal Palm Partnership." (Br. in Support of Motion to Stay at 8). All of the Defendants' claimed wrongdoing once Legisi became a limited partner in RP Investment stemmed from the alleged initial wrongdoing by the FINRA Defendants through Sierra Equities in inducing McKnight to invest in Royal Palm. There are common factual questions between this litigation and the FINRA arbitration, and a stay of this action would be appropriate because the arbitration could, arguably, resolve some of the contested issues in this case.

Gordon asserts that he may be prejudiced in this federal lawsuit because he is entitled to broad discovery, whereas the discovery allowed in a FINRA arbitration is far more limited. Thus, he believes that if the FINRA arbitration results in a finding of no liability on the part of the FINRA Defendants, he will be prejudiced in attempting to establish the vicarious liability of the Royal Palm Defendants because he may be collaterally estopped from raising the issue and would not have had the benefit of discovery in a federal forum to establish the FINRA Defendants' primary liability. However, the rules of the FINRA arbitration governing discovery are a part of that to which Gordon

17

agreed when he signed the agreement to arbitrate his claims against the FINRA Defendants. Thus, he must resolve the underlying primary liability of the FINRA Defendants according to the rules of procedure of the forum in which he chose to press those claims.

Furthermore, the cases cited by Gordon are distinguishable from the instant case. In *Source One, USA, Inc. v. Challenge, Inc.*, No. 09-13275, 2009 WL 3464707, at *11 (E.D. Mich. Oct. 22, 2009), the court denied a motion to stay the litigation of non-arbitrable claims because it found that the non-arbitrable claims were "separate and distinct" from the plaintiff's arbitrable claims. Here, however, the non-arbitrable claims are factually intertwined with the arbitrable claims and the latter depend on factual determinations that could resolve some of the causes of action in this case. Likewise, the Court in *RMF Nooter, Inc. v. Gleeson Constructors, LLC*, No. 1:06-CV-298, 2006 WL 3290126, at *8 (W.D. Mich. Nov. 13, 2006), denied a motion to stay because it held that the non-arbitrable claims were independent from those that belonged in the arbitral forum and noted that the moving defendants would not be bound by any arbitration award. However, in this case, because many of Gordon's claims are based on a theory of vicarious liability, a determination in the FINRA arbitration could collaterally estop him in the instant case.[6] As noted above, the claims in this case appear to be factually intertwined with those set forth in the FINRA arbitration.

Because of the common factual issues and possible preclusive effect of an arbitration ruling, the Royal Palm Defendants' motion to stay the litigation pending a resolution of the arbitration is granted.

VI.

---

[6] The Court has not made any ruling as to the collateral estoppel effect of the arbitration ruling, in that it is an issue that will be addressed later if it becomes necessary.

For the reasons that have been set out above, the Court (1) grants the FINRA Defendants' motion to dismiss this action without prejudice as to Goddard, Lichtenstein, and Bloom; (2) denies the FINRA Defendants' motion for sanctions; and (3) grants the Royal Palm Defendants motion to stay.

IT IS SO ORDERED.

Dated:  March 8, 2011                                s/Julian Abele Cook, Jr.
       Detroit, Michigan                         JULIAN ABELE COOK, JR.
                                                                United States District Court Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 8, 2011.

                                                                                       s/ Kay Doaks
                                                                                       Case Manager