UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT D. GORDON, RECEIVER OF
LEGISI MARKETING, INC., GREGORY N.
MCKNIGHT AND LEGISI HOLDINGS,
LLC,

            Plaintiff,

              v.

ROYAL PALM REAL ESTATE
INVESTMENT FUND I, LLLP, ET AL.,

            Defendants.

_____/

Case No. 09-11770

SENIOR U. S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
ELIZABETH A. STAFFORD

**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [153] AND DENYING PLAINTIFF'S PARTIAL SUMMARY
JUDGMENT [150]**

This case concerns a receiver, appointed on behalf of a convicted Ponzi-

schemer, who seeks to recover funds invested in an allegedly fraudulent investment

scheme. From 2006 to 2008, Gregory McKnight operated a $72 million Ponzi

scheme through his companies Legisi Marketing, Inc. and Legisi Holdings, LLC

("Legisi Companies"). In 2007, McKnight and the Legisi Companies invested nearly

$10 million in Defendant Royal Palm Real Estate Investment Fund, LLLP (the

"Fund"). The entire investment was derived from funds obtained through the Legisi

Ponzi scheme.

In May 2008, the Securities Exchange Commission ("SEC") commenced an action against McKnight and Legisi in this District. *Gordon v. Mazu Publishing,Inc.*, Case No 09-13953; *Sec. and Exch. Comm. v. Gagnon*, Case No.10-11891. Plaintiff Robert Gordon was then appointed as the receiver of the estates of McKnight and Legisi. Plaintiff maintains that Defendants, persons and entities involved in the management and formation of the Fund, engaged in a fraudulent scheme and made material misrepresentations in connection with the sale of securities to McKnight and Legisi. Plaintiff filed this action alleging federal securities claims and claims under Michigan and Florida law.

Before the Court is Plaintiffs' Motion for Partial Summary Judgment on breach of contract and statutory duties against the Fund and Bruce Rosetto [150], filed on July 11, 2019, as well as Defendants' Motion for Summary Judgment [153] on all claims, filed on July 5, 2019. On August 12, 2019, Defendants filed a Response [155] to Plaintiffs' motion and on August 26, 2019, Plaintiffs filed a Reply [160]. On August 13, 2019, Plaintiff filed a Response [153] to Defendants' motion and on August 26, 2019, Defendants filed a Reply [161]. On January 28, 2020, the Court held oral argument on the motions. For the reasons explained below, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment [150] and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment [153].

**FACTUAL BACKGROUND**

## I.       Legisi Ponzi Scheme

In December 2005, Gregory McKnight began offering and selling unregistered investment contracts in a pooled investment program called Legisi.com ("Legisi Program"). In February 2006, McKnight formed Legisi Holdings, LLC.[1] In January 2007, McKnight formed Legisi Marketing, Inc., a company used to hold and invest funds he received from investors.

Legisi was a Ponzi scheme which reported fictitious profits and used principal investments to pay other investors. Legisi promised returns ranging from 7.5% to 15% per month or 90% to 180% per year. (ECF No. 153-30). By November 2007, Legisi had raised over $72 million from 3,000-5,000 investors. (*Id.*).

## II.      Royal Palm entities and Sierra

Defendants Bruce, Robert, and Roxanne Rosetto[2] are Florida residents involved in the formation and management of various business entities. The entities include the following Defendants: The Fund; Royal Palm Investment Management

---

[1] The Legisi Program represented that it was a wholly-owned subsidiary of Legisi Holdings.

[2] Bruce and Roxanne are husband and wife. Robert is their son.

Company, LLC ("Management Company"); and Royal Marketing Services, LLC ("Royal Marketing").[3]

Bruce Rosetto was corporate and securities counsel for a separate entity, the Sierra Equity Group, LLC ("Sierra"). Former defendants in this action, Alan Goddard, Michael Lichtenstein, and Eric Bloom, were members of Sierra.

Beginning in late 2006, the Rosettos, along with Goddard, Lichtenstein, and Bloom, formed Royal Marketing. Bruce and Roxanne Rosetto are 50-50 members of Royal Marketing. (ECF No. 158-18).

The Rosettos also formed the Management Company with Goddard, Lichtenstein, and Bloom, who are the Company's members. (ECF No. 159-7). It is alleged that Bruce and Roxanne Rosetto are 25% members of the Management Company.

Plaintiff alleges that the Rosetto Defendants, along with Goddard, Lichtenstein, and Bloom, carried out several interconnected investment schemes to defraud investors and operated a Ponzi scheme through the Royal Palm entities. (ECF No. 158, PageID. 6129-6137).

---

[3] Hereinafter, the Fund, the Management Company, and Royal Marketing may be referred to collectively as the "Royal Palm entities."

### III.   The Fund

In January 2007, the Rosettos and Goddard began to form the Fund. The Fund's stated purpose was to buy and sell real estate properties in Florida, mostly homes and condominiums. (ECF No. 153-27). The Management Company, a separate entity managed by Bruce Rosetto, was the General Partner of the Fund. Bruce Rosetto was responsible for creating the Fund and for day-to-day business decisions.

On March 14, 2007, Lichtenstein, on behalf of the Fund and other Royal Palm entities, called McKnight to offer and sell securities to him by phone. Plaintiff alleges that Lichtenstein promised high gains within a short period of time and made material omissions in connection with the offer and sale. Specifically, Mr. McKnight was promised an 8% annual return to be paid quarterly. (ECF No. 153-4). By March 22, 2007, McKnight and Legisi committed to invest $5-10 million in the Fund. (*Id.*) Between April and June 2007, Legisi invested a total of $9,440,068.55 in the Fund. Compl. ¶ 93, 94. All of the funds invested were derived from the Legisi Ponzi scheme.

On May 9, 2007, Sierra and the Fund entered into a Selling Agreement according to which Sierra became the Fund's selling agent. Compl. ¶ 57

On May 11, 2007, McKnight, on behalf of Legisi, signed the Partnership Agreement making Legisi Marketing the Fund's only limited partner. Compl. ¶ 97

On May 15, 2007, McKnight told Goddard, Lichtenstein, and Bloom that he and Legisi had been subpoenaed by Michigan's Office of Financial and Insurance Services. (ECF No. 158-8, PageID. 6361). On May 25, 2007, the SEC subpoenaed McKnight and Legisi. Goddard, Lichtenstein, and Bloom referred McKnight to Sierra's attorney who agreed to represent McKnight. (*Id.*) After he was subpoenaed, McKnight transferred nearly $7 million to the Fund.

In the months that followed, the Rosettos, and Goddard, Lichtenstein, and Bloom changed the terms of the Fund's Offering. (ECF No. 158, PageID. 6133-37). Plaintiff claims that such changes were neither disclosed to McKnight nor Legisi. (*Id.*). Plaintiff also claims that Mr. McKnight did not receive the following disclosures before investing the Fund: loan payments to Sunrise Catering (a business acquired with a property the Fund purchased), Roxanne and Robert Rosetto's lack of property management experience, and a change to the 8% yearly return he was verbally promised. (*Id.*) In October 2007, the final transaction documents were delivered to McKnight and Legisi upon his request. (*Id.*) Mcknight claims that if he had known all this information beforehand, he would not have invested, however, upon receiving these disclosures he did not object or express any concerns. (ECF

No. 158-8, PageID. 6386). The Fund ultimately bought three commercial properties which were managed by the Rosetto family. (ECF No. 159-32, PageID. 7277). In spring of 2008, while investigating Legisi, the SEC froze Legisi's assets and effectively ended the Fund's investments. (ECF No. 159-68).

PROCEDURAL HISTORY

## I.    Related Proceedings

### A. SEC action and FINRA arbitration

On May 5, 2008, the SEC commenced an action alleging violations of various securities laws against McKnight and Legisi. *United States Securities and Exchange Commission v. McKnight, et al.*, No. 08-11887 (E.D. Mich. 2008) ("SEC Action"). The Court appointed Robert Gordon as the receiver for the estates of McKnight and Legisi Holdings.

On March 23, 2009, Plaintiff commenced a FINRA Action (No. 09-01690) against Goddard, Lichtenstein, and Bloom ("FINRA Respondents").[4] "The FINRA claims were premised on the FINRA Defendants' alleged misconduct in recommending certain investments to Legisi Marketing through McKnight, including the approximately $9.4 million that Legisi Marketing had invested in [the

---

[4] The Rosetto Defendants were not subject to FINRA's jurisdiction.

Fund]." (ECF No. 64, PageID. 1497). The parties entered into arbitration. On March 20, 2015, Plaintiff and the FINRA Respondents reached a settlement.

On July 14, 2015, the Court, in the SEC Action, granted Plaintiff's Motion for Order Approving Settlement Resolving Claims Asserted in FINRA Arbitration. (ECF No. 627). On January 9, 2016, the FINRA arbitration award became final. The SEC Action remains pending.

### B. Criminal proceedings against McKnight

On February 14, 2012, the Government filed an Information charging McKnight with Wire Fraud. *United States v. McKnight*, No. 12-20101 (E.D. Mich. 2012). Pursuant to a Rule 11 Plea Agreement, McKnight pleaded guilty to Wire Fraud on February 16, 2012. On August 7, 2013, the Court sentenced McKnight to 15 years and 8 months of imprisonment and ordered him to pay $48.9 million in restitution. The Sixth Circuit affirmed McKnight's conviction on June 18, 2014. Neither party has provided the amount of restitution still owed to Legisi's victims.

## II.    The Instant Action

Plaintiff commenced this action on May 7, 2009. In the original complaint, Plaintiff named as Defendants: the Fund; the Management Company; Royal Marketing; Bruce, Robert, and Roxanne Rosetto; and the FINRA Respondents.

On March 8, 2011, the Court dismissed without prejudice the FINRA Respondents on the basis that the claims Plaintiff asserted against them were within the scope of the FINRA arbitration agreement. The Court stayed the action against the remaining Defendants pending resolution of the FINRA arbitration.

On December 9, 2016, the Court lifted the stay. On November 7, 2017, Plaintiff filed the Second Amended Complaint [101] ("Complaint") alleging: Violation of § 10(b) of the Securities Exchange Act and SEC Rule 10b-5 (Count I); Violation of § 78t of the Exchange Act (Count II); Violation of the Michigan Uniform Securities Act (Count III); Violation of the Florida Securities Transaction Act (Count IV); Breach of Partnership Agreement (Count V); Violation of Florida Revised Uniform Limited Partnership Act (Count VI); Common Law Breach of Fiduciary Duty (Count VII); Common Law Fraud (Count VIII); Innocent Misrepresentation (Count IX); Avoidance of Fraudulent Transfers Pursuant to M.C.L. § 566.35(1) (Count X); Avoidance of Fraudulent Transfers Pursuant to M.C.L. § 566.34(1) (Count XI); Aiding/Abetting Tortious Conduct (Count XII); Tortious Interference with Contract (Count XIII); Silent Fraud (Count XIV); and Fraudulent Inducement (Count XV).

After the Court granted in part and denied in part Defendants' Motion to Dismiss on May 25, 2018, the following claims remain: Plaintiff's scheme liability

claims set forth in Counts I, II, and IV against the Rosetto Defendants; Counts V and VI against Defendants Bruce Rosetto and Royal Palm Investment Management Company; and Counts X and XI against all Defendants. Plaintiffs seeks summary judgment on Counts V and VI; Defendants seek summary judgment on all claims.

LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). Additionally, where "the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each

instance to draw all reasonable inferences against the party whose motion is under

consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting

*Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

ANALYSIS

## I.   Counts I, II, and IV: Scheme Liability Claims

SEC Rule 10b-5 makes it unlawful for a person, in connection with the

purchase or sale of a security:

a)  To employ any device, scheme, or artifice to defraud,
b)  [ . . . ]
c)  To engage in any act, practice, or course of business which operates or
    would operate as a fraud or deceit upon any person.

Furthermore, to support a control-persons claim under 15 U.S.C. § 78t, Plaintiff must

sufficiently plead an underlying or primary securities law violation. *Doshi v. Gen.*

*Cable Corp.*, 823 F.3d 1032, 1045 (6th Cir. 2016).

Under Rules 10b-5(a) and (c), individuals who participate in a scheme with

the purpose and effect of misrepresenting material information in the connection

with the sale of securities may be held liable in a private action. *See Stoneridge*

*Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 128 (2008);

*Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 610 (6th Cir. 2005).

"To state a claim based on conduct that violates Rule 10b-5(a) and (c), [a] plaintiff must allege that a defendant[:] (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries." *Kerrigan v. Visalus, Inc.*, No. 14-CV-12693, 2016 WL 892804, at *15 (E.D. Mich. Mar. 9, 2016) (internal citation and quotation marks omitted), *see also In re Checkers Sec. Litig.*, 858 F. Supp. 1168, 1180 (M.D. Fla. 1994) ("The Florida statutory requirements are identical to Rule 10b–5.").

Defendants argue that they are entitled to summary judgment on these claims, because they did not coordinate a fraudulent scheme; the purpose of the Fund was to invest in commercial properties, which it did, and this was Mr. Mcknight's understanding. (ECF No. 153, PageID. 5227-28). Plaintiff argues that Defendants' omissions and misrepresentations regarding distributions, profit sharing, management fees, loans from the Fund to Sunrise Catering (a building tenant), potential conflicts of interest, and Robert and Roxanne Rosetto's lack of real estate management expertise amount to evidence of a fraudulent scheme. (ECF No. 158, PageID. 6143-46, 6148). Looking at the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's allegations do not amount to a fraudulent scheme under Rule 10b-5(a) and (c).

In order to succeed on a 10b-5(a) and (c) claim, Plaintiff must 1) "inherently deceptive act that is distinct from an alleged misstatement," *Byrd v. ViSalus, Inc.*, No. 17-cv-12626, 2018 WL 1637948, *10 (E.D. Mich. Apr. 5, 2018); and 2) cannot use statements and/or omissions that occurred after the sale of securities. *Resource Investors Group v. Natural Resource Inv. Corp.*, 457 F. Supp. 194, 197 (E.D. Mich. 1978).

First, omissions and misrepresentations alone cannot form the basis of a fraudulent scheme. Plaintiff must "sufficiently alleged a scheme to defraud separate and apart from [Defendants'] alleged misrepresentations." *Byrd,* 2018 WL 1637948, *4; s*ee also S.E.C. v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011) ("[s]cheme liability . . . hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." In *Byrd*, the court dismissed plaintiff's fraudulent scheme claims when it found that the plaintiff's allegations primarily rested on misstatement and omissions, "not on a fraudulent scheme that existed separate from those misstatement." *Byrd,* 2018 WL 1637948, *10. The same is true here.

Plaintiff alleges that Defendants failed to disclose or misrepresented certain information, and if he had known the truth, he would not have invested in the Fund. Analogous to *Byrd*, Plaintiff's claims must fail for want of a fraudulent scheme, separate and apart from the current allegations.

Second, it follows that because this rule creates liability for conduct in connection with the purchase or sale of a security, "conduct occurring after a sale cannot be the basis of liability under section 10(b) or Rule 10b-5." *Resource Investors Group v. Natural Resource Inv. Corp.*, 457 F. Supp. 194, 197 (E.D. Mich. 1978); *Ohashi v. Verit Industries*, 536 F.2d 849 (9th Cir. 1976); *Wolford v. Equity Resources Corp.*, 424 F. Supp. 670 (S.D. Ohio 1976); *Kogan v. National Bank of North America*, 402 F. Supp. 359 (E.D.N.Y. 1975).

In his defense, Plaintiff argues that U.S. Supreme Court case *Lorenzo v. S.E.C.* recognizes overlap between the 10b-5 provisions and allows 10b-5 (a) and (b) liability when a defendant disseminates false or misleading statements. 139 S. Ct. 1094, 1099 (2019). In *Lorenzo*, an investment banker sent an email, on behalf of his boss, to potential investors in his client's energy company containing false and misleading information about the company's worth. *Id.* Although the investor made misrepresentations, the Court held that he could still be liable for participating in a fraudulent scheme because the 10b-5 provisions are not mutually exclusive. *Id.* at 1102.

There are two-key differences between Lorenzo and the case at hand. First, Lorenzo's false statements were made before the purchase of securities, in solicitation. In contrast, Plaintiff's primarily allege that Defendants made

misstatements after the sale of securities in the Fund. Second, although Lorenzo was not the "maker" of the misstatements, he disseminated the information himself, making him liable for participating in a fraudulent scheme. McKnight repeatedly claims that he only relied on Lichtenstein's statements, absent any orchestration from any of the Defendants. (ECF No. 153-4, PageID. 5529). Therefore, Plaintiff's allegations cannot support his scheme liability claims and Defendants are entitled to summary judgment as a matter of law.

Because the Court holds that Defendants did not participate in a fraudulent scheme under 10b-5(a) and (c), it is immaterial for the Court to opine on whether Plaintiff relied on such a scheme, whether the scheme caused him his alleged injuries and whether Plaintiff ratified his investment in the scheme. Furthermore, without an underlying securities law violation, Plaintiff's claims under 15 U.S.C. § 78t and the Florida Securities Transaction Act must also fail.

## II.      Counts V and VI: Breach of Contractual and Statutory Duties against Bruce Rosetto and the Royal Palm Investment Management Company

On or about May 11, 2007, McKnight, on behalf of Legisi Marketing, signed a signature page and entered into a Partnership Agreement for the Investment Fund. In addition to their duties under the Partnership Agreement, Management Company, Royal Marketing Services, Robert Rosetto, Roxanne Rosetto, and Bruce Rosetto

owed to Legisi and McKnight a statutory duty of care, Fla. Stat. § 620.1110(2)(f), a statutory duty of good faith and fair dealing, Fla. Stat. § 620.1110(2)(g), and a statutory duty of loyalty, Fla. Stat. § 620.1110(2)(e), and Fla. Stat. § 620.1408.

Both parties move for summary judgment regarding Bruce Rosetto's and the Management Company's alleged breach of their duties to Plaintiff as well as the Partnership Agreement. Plaintiff argues that Defendants breached their duties by engaging in four categories of improper transfers totaling $401,227: (1) making payments to Bruce Rossetto's law firm for fees and costs allegedly unrelated to the Fund ($73,561) (2) the Fund's payment to Rosetto & Associates ($8,123) (3) the Fund's loans to Sunrise Catering ($180,000) and (4) the Fund's transfers to the Realty Fund II ($139,543). Because the Partnership Agreement gave Defendants' broad power over Fund investments and payments, summary judgment is found in their favor.

Defendants unpersuasively argue that they did not breach the contract because Plaintiff breached it first by fraudulently inducing them into accepting money from a Ponzi scheme. However, even a casual Google search of Legisi in May of 2007, when the Defendants accepted its money, would have found a CNN Money article imploring investors to be wary that Legisi was a possible scam due to its outlandish promises of over 10% per month returns. (ECF No. 158-26).

More persuasively, Defendants argue that they are entitled to summary judgment because their actions were agreed to by Legisi in the Partnership Agreement and its subsequent amendments and that their potential conflicts of interests and other disclosures were revealed by the Subscription Agreement that Plaintiff also signed.

Article V, Section 5.01 of the Partnership Agreement contains the following key provision:

> The General Partner shall have the exclusive right and responsibility to manage the business of the Partnership and is hereby authorized to take any action of any kind and to do anything and everything the General Partner deems necessary in connection therewith . . . [t]he General Partner is authorized and empowered on behalf of and the name of the Partnership to enter into, execute, maintain and/or terminate contracts, undertakings, agreements and any and all other documents and instruments in the name of the Partnership, and do or perform all such things as may be necessary or advisable in furtherance of the Partnership's powers, objects or purposes or to the conduct of the Partnership, and do or perform all such things as may be necessary advisable in furtherance of the Partnership's powers, objects or purposes or to the conduct of the Partnership's activities, as the General Partner deems necessary or advisable. . . [including] (b) borrow money . . . [and] (c) hire for usual and customary payments and expenses consultants, brokers, attorneys, and such other agents for the Partnership as it may deem necessary.

(ECF No. 153-27, PageID. 5811). The Subscription Agreements additionally state that "the Subscriber understands, acknowledges and agrees that the General Partner will be entering into various agreements or relationships with related parties and

affiliates of the General Partner and that the Subscriber will not have any ability to review, approve, or otherwise consent to any such related party agreement." (ECF No. 153-15, PageID. 5644). Furthermore, it states that "[t]here can be no assurance that the proceeds derived from this offering will be used in the manner described as the Company has complete discretion over the use of the funds." (*Id.* at 5648).

Moreover, Florida statutory duties govern only "[t]o the extent the partnership agreement does not otherwise provide." Fla. Stat. § 620.1110. However, here, Plaintiff gave explicit consent in the agreements for Defendants to engage in the activities Plaintiff now objects to. Therefore, the Court grants summary judgment to Defendants on these claims.

### III.    Counts X and XI: Avoidance of Fraudulent Transfer Claims

Under the Uniform Fraudulent Transfers Act ("UFTA"), a creditor can void a debtor's transfer which was was fraudulently obtained. In relevant part the statues state:

> (1) A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following circumstances:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation

Mich. Comp. Laws § 566.35, § 566.34. Here, the receiver, as creditor, is attempting to void the transfer of McKnight's $9,440,068.55 investment in Defendants' Fund.

Defendants argue that they are entitled to summary judgment here for the following reasons: (a) Plaintiff lacks standing because he cannot be both a transferor and a creditor, UFTA does apply to this situation, and (b) Defendants received Plaintiff's investment in good faith and Plaintiff received a reasonably equivalent value for its investment.

### a. Standing

As this Court has already found, the receiver has standing to Plaintiffs' UFTA claims. A receiver has standing to bring a claim if at least one of the receivership entities would have had standing to bring the claim. Wuliger, 567 F.3d at 794 (6th Cir. 2009). Because Legisi, one of the receivership entities would have had standing to bring avoidance of fraudulent transfer claims, Plaintiff has standing to bring such

claims. *See Coppola v. Manning*, No. 323994, 2015 WL 7288050, at \*5 (Mich. Ct. App. Nov. 17, 2015) (noting that the receiver "had standing to pursue lawsuits on behalf of ReCellular for the purpose of protecting the receivership estate[.]").

In addition, several other circuits have explicitly held that a receiver in a Ponzi scheme case may be considered a creditor for purposes of standing. *See Evans v. Burrell*, No. CV 14-330-GFVT, 2015 WL 5772414, at \*6 (E.D. Ky. Sept. 30, 2015) (citing *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 192 (5th Cir. 2013); *Wing v. Dockstader*, 482 F. App'x 361, 363 (10th Cir. 2012); *Donnell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008); *Scholes v. Lehmann*, 56 F. 3d 753-55 (7th Cir. 1995)). Accordingly, the Court rejects Defendants' argument that Plaintiff lacks standing to pursue avoidance of fraudulent transfers claims on behalf of the receivership.

### b.  UFTA Application

Defendants argue that under *Bancorp*, the UFTA is not applicable because it "does not contemplate transfers of stolen money" such that "where assets are acquired illegally and transferred to third parties, creditors can pursue possessory causes of action such as constructive trusts, equitable liens, or statutory conversion." *Alliance Bancorp v. Select Mortgage, LLC*, No. 274853, 2008 WL 724092, \*2 (Mich. Ct. App. Mar. 18, 2008).

Plaintiff argues that *Bancorp*'s reasoning does not capture the distinction between title conversion and false pretense. The Court agrees. In *In re Teleservices Grp., Inc.*, the court found the following:

> *Alliance Bancorp* failed to appreciate an important distinction in *Newpower*. There is no question that a thief who commits the crime of larceny (i.e., taking another's property without the owner's consent) gains no title to what has been stolen. Title remains instead with its rightful owner. However, if the theft is accomplished by false pretenses, title is transferred because the "owner intend[ed] to part with both title and possession, albeit for the wrong reasons." *Newpower,* 233 F.3d at 929. Or, to put it differently, when the thief "fraudulently convinces another to part with *both* possession and title to the property [i.e., commits the crime of false pretenses] ... the offender obtains voidable title to the property." *Id.* (emphasis in original). Therefore, *Alliance Bancorp's* conclusion that the debtor in that instance had not acquired a transferable interest in his victims' money is simply wrong.

*In re Teleservices Grp., Inc.*, 469 B.R. 713, 762–63 (Bankr. W.D. Mich. 2012). Here, although McKnight admittedly misrepresented high returns to his investors (ECF No. 153-30), his investors transferred title of willfully and voluntarily. Therefore, Mcknight possessed lawful title of Legisi investments, albeit under false pretenses. Accordingly, Plaintiffs' UFTA claims are applicable.

### c.  Legisi Transfers were made with Actual Intent to Defraud

Neither party disputes that McKnight operated a fraudulent Ponzi scheme through Legisi entities. (*See* ECF No. 161, PageID. 7582; ECF No. 153, PageID.

5243; ECF No. 158, PageID. 6171). Under the "Ponzi scheme presumption," courts have found that investment transfers through Ponzi schemes are presumed to be made with "actual intent to hinder, delay or defraud" creditors. *See In re Bernard L. Madoff Inv. Secs. LLC*, 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) (finding that the 'Ponzi scheme presumption' establishes a debtor's fraudulent intent). Therefore, under this presumption, the actual intent to defraud element of Plaintiff's UFTA claims is satisfied.

### d. Defendants Received Legisi's Investment in Good Faith and Provided a Reasonably Equivalent Value

Plaintiff has presented a genuine dispute of material fact regarding Defendants' good faith and Plaintiff's receipt of a reasonable equivalent value for his investment. In order to determine if a transferee received funds in good faith, courts apply an objective test. Under this test, courts "look to what the transferee objectively knew or should have known rather than examining what the transferee actually knew from a subjective standpoint. If the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." *In re World Vision Ent., Inc*., 275 B.R. 641, 658 (Bankr. M.D.Fla. 2002).

Here, Defendants received no shortage of red flags regarding Plaintiff's fraudulent purposes. Legisi's website contained outlandish promises of high returns,

which Bruce Rosetto concluded was an "untenable business proposition." (ECF. No. 158-3, PageID. 6269-70). A google search of Legisi would have also found the CNNMoney.com article which labeled Legisi as a "possible scam" and highlighted its website as containing red flags for potential investors. (ECF No. 158-26). Sierra even prepared a Suspicious Activity Report about Legisi which Bruce Rosetto merely dismissed as "foolish." (ECF No. 158-39; 158-40, PageID. 6791). But perhaps the most glaring red flag was the SEC's inquiry to Sierra regarding Legisi's investments. (ECF No. 141-3). This evidence indicates that a valid dispute regarding whether Defendants knew or at least should have known of Plaintiff's fraudulent transfer.

Looking at the evidence in the light most favorable to the non-moving party, Plaintiff's expert witness presents a genuine dispute of material fact regarding whether Plaintiff received a reasonably equivalent value for its $9,440,069 investment. He concludes that "[d]ue to the effective 50% dilution of Legisi's investment, the properties held by the single purpose entities would have needed to significantly out perform the average return of comparable properties for Legisi to merely recover its initial investment. Indeed, a significantly higher rate of return would have been required for Legisi to receive a reasonable return on its investment in excess of its initial contribution." (ECF No. 159-32, PageID. 7293). This evidence

indicates that a reasonable juror could conclude that Legisi and McKnight did not receive the reasonable equivalent value for their investment. Plaintiff has therefore presented sufficient evidence for the UFTA claims to survive summary judgement.

### CONCLUSION

For the reasons explained above, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment [150] and **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment [153].

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment [150]is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [153] is **GRANTED IN PART AND DENIED IN PART.**

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: May 31, 2020                Senior United States District Judge